# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

MICHAEL MCEVOY, on behalf of himself
and others similarly situated,

      Plaintiff,

APOLLO GLOBAL MANAGEMENT, LLC,
a Delaware limited liability
company, APOLLO MANAGEMENT VI, L.P., a
Delaware limited partnership, and CEVA
GROUP, PLC,

      Defendants.

_____/

Case No.: 3:17-cv-00891-TJC-MCR

JURY TRIAL DEMANDED

## AMENDED CLASS ACTION COMPLAINT

Plaintiff, MICHAEL MCEVOY, individually and on behalf of himself and all others similarly situated, by his attorney, alleges the following based on the investigation of his counsel, except as to allegations specifically pertaining to Plaintiff, which are based on his personal knowledge.

## NATURE OF THE ACTION

1.     This is a class action seeking to recover damages caused by Defendants' respective breaches of duties owed to the Management Co-Investors, owed to them by virtue of the 2006 CEVA Investments Limited Long-Term Incentive Plan (the "LTIP"), that resulted in the Management Co-Investors' individual monetary losses in the approximate amount of €30,000,000, subject to appropriate adjustments.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§1332(d)(2)(a) and (b) as the amount in controversy exceeds the sum or value of $5,000,000 exclusive of interests

and costs, and Michael McEvoy is a citizen of a State different from Defendants. Upon information and belief, other putative class members are citizens or subject to a foreign state, and Defendants are citizens of a State.  Moreover, this Court likewise has subject matter jurisdiction pursuant to 15 U.S.C. § 80-b14.

3.      Venue is properly vested in this Court under 28 U.S.C. § 1391 as the damages suffered by Michael McEvoy occurred in Duval County, Florida and, therefore, the causes of action alleged herein accrued in Duval County, Florida.

## PARTIES AND RELEVANT ACTORS AND TRANSACTIONS

4.      Plaintiff, Michael McEvoy ("Plaintiff") is a former employee of CEVA Logistics (as defined below) residing in Duval County, Florida who was previously employed by TNT (as defined below) by and through its North American operations located at TNT's Jacksonville, Florida headquarters prior to the acquisition of TNT by Apollo Global Management, LLC (as defined below).  The Management Co-Investors are current and former employees of CEVA who were required as a condition of employment to participate in the LTIP.

5.      Non-party, CEVA Investments Limited (f/k/a Louis Topco Limited) is now known as CIL ("CIL").  Until the 2013 Transaction (as defined below), CIL directly and indirectly owned 99.9% of the shares of Non-Party CEVA Group, PLC ("CEVA Group").  At all times relevant to this Amended Complaint, CEVA Group was the holding company for the CEVA Logistics operating entities that employed the Management Co-Investors, prior to the 2013 Transaction. (The CEVA Logistics operating entities owned by CEVA Group are collectively referred to herein as "CEVA Logistics").

6.      Upon information and belief, CIL was a holding company that, by and through ownership of shares of CEVA Group, was the immediate parent of CEVA Group and existed for

the purpose of reducing risks to its shareholders and exercised complete dominion and control over CEVA Group, PLC ("CEVA Group") and CEVA Logistics (CEVA Group and its operating subsidiaries). At all times relevant hereto, prior to the 2013 Transaction (as defined below), CEVA Group was the wholly owned subsidiary of CIL.

7.      Upon information and belief, CEVA Logistics is one of the world's largest non-asset-based freight management and supply chain logistics companies, conducting logistics and freight management business from approximately 1000 locations in 160 countries. CEVA Logistics' worldwide operations are the product of the acquisition and amalgamation by Apollo Global (as defined below) in 2007, of TNT Logistics ("TNT"), a global contract logistics company based in Hoopdorf, Netherlands, and EGL, Inc. ("Eagle") a global freight management company based in Houston, Texas.

8.      Defendant, Apollo Global Management LLC ("Apollo Global") is a limited liability company formed under the laws of the state of Delaware and has offices at 9 West 57th Street, New York, New York 10019.

9.      Defendant, Apollo Global, upon information and belief, as of March 31, 2013, had complete dominion and control over CIL and CEVA Group by virtue of Apollo Global being the majority shareholder of CIL.[1]   Upon information and belief, at all times relevant to the allegations contained in this Amended Complaint, Apollo Global exercised complete dominion and control over Apollo Management VI, L.P., as its parent company, and CIL and CEVA Group from its offices in New York, New York.

---

[1] Upon information and belief, Apollo Global controlled CIL through the majority interests of AP VI CEVA Holdings, L.P., AlpInvest Partners Beheer 2006, L.P., AAA Guarantor Co-Invest VI (B), L.P., and Louis Cayman Second Holdco, Ltd. (the "Apollo Shareholders"), all of whom were controlled by Apollo Global.

10.     Defendant, Apollo Management VI, L.P. ("Apollo Management VI") is a Delaware limited partnership, and has its offices at 9 West 57th Street, New York, New York 10019, that acts as the investment manager and investment advisor[2] to all investments in funds, partnerships, and special purpose vehicles associated with Apollo Investment Fund VI, L.P.[3] and its associated portfolio companies.

11.     Apollo Management VI, L.P. is also the Sponsor of the 2006 LTIP, formed a partnership with the Management Co-Investors, as described herein (along with Apollo Global Management, LLC), and was the Investment Advisor to the 2006 LTIP participants, i.e. the Management Co-Investors.[4]

12.     The 2013 Transaction was an integrated 5 step transaction, resulting in the restructuring and recapitalization of CEVA Group, the creation of a new holding company, CEVA Holdings, LLC ("CEVA Holdings") to retain newly issued CEVA Group equity, the dilution of CIL equity in CEVA Group, the liquidation of CIL, and other transactions.

## CLASS ACTION ALLEGATIONS

13.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a), 23(b)(1), and 23(b)(1)(3), on behalf of a class consisting of current and former employees of CEVA Logistics, the Management Co-Investors (as defined above), and as Partners in a partnership with Apollo Management VI, L.P. and Apollo Global Management, LLC, who owned restricted Class A shares of stock in CIL on or before March 31, 2013. Excluded from the class of Management Co-Investors are Defendants, members of their immediate families, and their

---

[2] Apollo Management VI is registered with the Securities and Exchange Commission as an investment adviser.
[3] Non-Party, Apollo Investment Fund VI, L.P. is a Delaware limited partnership and private investment fund formed in 2005 to make private equity investments.
[4] The term "Apollo" refers to Apollo Global and Apollo Management VI, collectively.

legal representatives, heirs, successors and assigns, the officers and directors of CEVA Holdings, and CEVA Group, members of their immediate families, and their legal representatives, heirs, successors and assigns, and the officers and directors of Apollo Global.

14.     The Management Co-Investors are numerous, and geographically diverse across the United States and the world so that joinder is impractical.  Members of the Management Co-Investors may be identified from the Statement of Affairs of CIL as of May 15, 2013, attached hereto as Exhibit "1".

15.     Plaintiff's claims are typical of the claims of the other members of the Management Co-Investors in that all Management Co-Investors have been damaged by Defendants, which caused members of the Management Co-Investors to not receive, or not equally receive, a required adjustment during the 2013 Transaction.

16.     Plaintiff will fairly and adequately protect the interests of other members of the Management Co-Investors.  To assist him, Plaintiff has retained counsel. Plaintiff is not aware of any interest which is antagonistic to the interests of the Management Co-Investors.

17.     Common questions of law and fact exist as to all of the Management Co-Investors and these predominate over any questions solely affecting individual members of the Management Co-Investors.  Among the questions of law and fact common to the Management Co-Investors:

a.  Whether the Defendants, breached their respectively owed duties to the Management Co-Investors, as partners, advisors and fiduciaries, including, but not limited to obligations arising under the LTIP, which caused damages to the Management Co-Investors;

b.  To what extent the Management Co-Investors sustained damages and what is the proper measure of damages;

      c.   To what extent a required co-investment in private equity transactions results in an implied partnership or joint venture with a private equity sponsor.

18.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impractical.  Furthermore, because the damages suffered by individual Management Co-Investors may be differing in amount, the expense and burden of individual litigation makes it impossible for members of the Management Co-Investors to pursue individual redress for the damages caused to them by Defendants' acts. Plaintiff is not aware of any difficulty that will be presented in managing this action as a class action.

## FACTUAL BACKGROUND

### The Transactions Comprising CEVA and Direct Co-Investment by Management

19.     In 2006, TNT entertained offers from multiple parties to engage in transactions effectuating the sale of its logistics division.

20.     The different parties that TNT entertained transaction negations with were referred to by management as Red, White, and Blue.  Red was the code word for Apollo Management VI, L.P.

21.     As members of senior management were significant holders of TNT equity, and Apollo needed their continued operational expertise to run a successful logistics company, those members of senior management participated in the negotiations that led up to the creation of the NewCo, which ultimately became CEVA Investments Limited and its wholly owned subsidiaries, operating under CEVA Group, PLC.  These negotiations were conducted for the benefit of all future Management Co-Investors, all holding shares in TNT, who were collectively required to contribute 9% of initial capital contributions (€15 Million) to "NewCo" in the transaction in which

Apollo partnered with Management Co-Investors to create CIL and CEVA Logistics (the "TNT Transaction").

22.     Apollo's expectations for employee participation were clear.  In 2006, during negotiations on the TNT Transaction with Apollo, it was noted to the Management Co-Investors, "make no mistake that Red requires decisions to support the company going forward…you chose to support the company with your time, talent and treasure […] or you don't."  Apollo also expected that the Management Co-Investors make this clear to other TNT management who would ultimately become Management Co-Investors.

23.     Other communications discussing the negotiations specifically referred to the mandatory investment commitments required to consummate the transaction, and the equity investment numbers "were advised to [each person] by Red in New York" and that "a number that is deemed too low will not be acceptable.  The above amounts give you a range in which you are expected to invest."

24.     As such, it was agreed that Apollo would make capital contributions to NewCo and provide consulting and advisory services concerning NewCo's financial and business affairs while the Management Co-Investors would make capital contributions to NewCo and contribute their collective operational expertise in the logistics industry.[5]

---

[5] Apollo was at all times aware that the success of NewCo hinged on the partnership of its key senior management. As an example, in the Form F-1/A filed by CIL on September 29, 2012, with the SEC in anticipation of a potential IPO of CIL, it was stated, *"we are dependent on key members of our leadership team and other qualified personnel, and an inability to attract and retain qualified employees could materially adversely affect us.*  Our ability to operate our business and implement our strategies depends, in part, on the efforts of key members of our leadership team and other qualified personnel, and our future success will depend on, among other factors, our ability to attract and retain qualified management, sales representatives, agents, carrier representatives and other qualified personnel. The loss of the services of our key employees or the failure to retain and attract other qualified personnel could have a material adverse effect on our business, results of operations and financial condition. Moreover, the market for qualified individuals may be highly competitive and we may not be able to attract and retain qualified personnel to replace or succeed members of our senior management or other key employees, should the need arise." (*Emphasis in original*). Indeed, the mandatory participation in equity by the Management Co-Investors was strategic to the success as a company.

25.     Upon information and belief, in the days following the meetings in New York, Apollo representatives gave a presentation regarding the analyses of the expected performance of the securities of NewCo.

26.     The ultimate equity term sheet was negotiated by a group of Management Co-Investors in New York, New York, with Apollo, and at times, with the law firm of Wachtell, Lipton, Rosen & Katz, acting as agent for Apollo.  The term sheet was governed by New York law.

27.     The Management Co-Investors conducting the negotiations as it related to management buy-in were also assigned investment participation goals to be made by other senior management considered to be directly under the control of the Management Co-Investors conducting the negotiations.

28.     Prior to the final consummation of negotiations by TNT, the senior managers, and Apollo, the senior managers entered into employment agreements and terms sheets which contained restrictive covenants, mandatory investment ranges in NewCo, Louis No. 3 Limited (currently known as Ceva Ltd.), and Apollo Management VI, L.P., and terms and conditions which would eventually be contained in the LTIP and its incorporated documents.

29.     Among the provisions of the employment agreement and term sheet was an adjustment provision stating that shares and options in the future company would be "equitably adjusted […] to prevent dilution in the event of […] recapitalizations or similar extraordinary capital transactions."

30.     Prior to the full roll-out and finalization of the transaction documents for Management Co-Investors, a document distributed by Apollo to the Management Co-Investors

addressing questions specifically regarding the requirements of the transaction stated, "[p]erception – people are putting in a big commitment into the Company themselves[.] Why would Apollo not facilitate a 'lending or grant' program to facilitate the equity commitment?" Among the answers provided by Apollo were,

> [a]s in any private equity transaction, Management is required to put their own money at risk to have some 'skin in the game'[;]
>
> Apollo will put up approx. Euro 325MM into this Company, which is a very large commitment compared to the total commitment of the Management team of approx.. Euro 15MM[;] [and]
>
> Apollo's representatives (relating to the TNT transaction) will individually commit their own capital into this transaction in the same way as Management[.]

31.    Eventually, upon the roll-out of the final plan, Apollo made recommendations as to lenders for Management Co-Investors who needed to obtain a loan to make the investment.  Apollo also provided tax advice as to how to structure the investment.

32.    It was also explained that no Management Co-Investor would lose their investment by virtue of their employment status.

33.    Apollo also explained that the future success of the company hinged on the successful syndication of the debt, which was "in the hands/controllable by the Management team and therefore […] Apollo and the management team [were] fully aligned[.]"

34.    Apollo Global made a presentation[6] to the Management Co-Investors just prior to the finalization of the transaction documents:

a.    "We are partners and we as sponsors commit ourselves personally and institutionally to the vision [;]"

---

[6] *See* Apollo presentation attached hereto as Exhibit "2".

    b.  "The program is structured to reflect our philosophy that management and the Sponsors should be partners with aligned incentives to generate substantial equity value and share in gains[;]"

    c.  "The combination of leverage provided to management through options as well as the equity returns on the deal will create significant investment returns. Apollo and management will create a "business case" that all parties will 'own' and will be the basis for driving shareholder value[;]"

    d.  "Bottom Line: Apollo and Management will be aligned to share in value creation[;]"

    e.  "Fair Market Value is generally determined by the Board of Directors of the Company in good faith, utilizing a number of factors[;]"

35.    The presentation by Apollo included analyses of the expectation of the performance of the securities of NewCo.  It was also stated during the presentation that an individual Q&A session with an Apollo financial representative would be arranged for each Management Co-Investor at a date to be determined.

36.    Indeed, it was also explained in later correspondence the importance of the Management Co-Investors participation in 'sweat and equity', that the ability to make public knowledge of the Management Co-Investors putting "skin in the game" was well received by the "market" during "road show presentations to financial institutions in the key centers, including the Credit Rating Agencies that are responsible for evaluating our credit risk against our business prospects for the future."

37.    Ultimately, the Management Co-Investors purchased the restricted shares in CIL based on Apollo Global's representations to the Management Co-Investors that the Management

Co-Investors would participate in the management of CEVA Logistics and that CEVA Logistics was to be operated as a "partnership" based upon good faith, mutual trust, and confidence, a common scenario in private equity transactions as opposed to typical strategic buyer transactions. *See* Jeffrey A. Blomberg, *Private Equity Transactions, Understanding Some Fundamental Principals*, ABA Business Law Today, Vol. 17, No. 3, Jan-Feb 2008, attached hereto as Exhibit "3". [7]

38.     In 2007, Apollo entered into a similar transaction with Eagle Global Logistics ("Eagle"), by which Apollo acquired Eagle and merged it into CEVA Group and CEVA Logistics (the "Eagle Transaction").  The Eagle Transaction was carried out in the same manner as the TNT Transaction, with regards to Eagle management becoming Management Co-Investors.

39.     Furthermore, after the consolidation of Eagle into CEVA, as CEVA Global hired new senior management employees, the mandatory direct co-investments were the same, on the condition of employment, and each additional Management Co-Investor had a private meeting with an Apollo individual to advise them of the recommended amount of investment based upon

---

[7] As explained by Blomberg, [i]deally the target must have […] founder[s] or principal[s] who will remain with the business and partner with the private equity sponsor to implement its strategy for growth and eventual exit."  Exhibit "3" at p. 2, ¶ 3. Blomberg further explains, "[a]dditionally, the private equity investor wants to partner with people who understand its business, share its strategies, and are likely to want to exit the investment when the private equity group so determines."  Exhibit "3" at p. 3, ¶ 2. In explaining the relationship between management and the private equity group, he writes, "[w]hile the financial sponsor is technically the seller's new "boss" as the employer, the relationship is portrayed as more of a partnership. It is for this reason that the financial sponsor insists that the new seller have an equity interest in the new company through either a rollover of existing stock or reinvestment of some of the proceeds received at the closing into the new parent holding company." Exhibit "3" at p. 2, ¶ 4. This is precisely the relationship that Apollo represented to have with the Management Co-Investors, to all Management Co-Investors.

ability, where to obtain a loan if needed, and analyses regarding performance of the securities.[8]
See, i.e., emails from Apollo to a new senior management member, attached hereto as Exhibit "5".

40.    Overall, Management Co-Investors contributed over €30,000,000 in direct co-investments, based upon an "alignment of interests" and "skin in the game" and for nearly all participants was the single largest investment aside from their home.[9]

### The 2006 CEVA Investments Limited Long-Term Incentive Plan

41.    Normally, direct co-investments into specific portfolio companies, by partners and partnerships that agree to co-invest, are structured in special purpose vehicles, each one dependent on its specific needs regarding taxes. The vehicle which Apollo created for the Management Co-Investors, and administration of their investment in the partnership0, was the LTIP, attached hereto as Exhibit "4".  Upon information and belief, the purpose of the LTIP was to provide a special purpose vehicle to administer the co-investments, for direct co-investments by senior management, in a manner that would be tax efficient. The LTIP was "structured to reflect [Apollo's] philosophy that management and the Sponsors should be partners with aligned incentives[.]"

42.    The LTIP was for the benefit of CIL **and** CEVA Group and was governed by Delaware law.  The Sponsor of the LTIP was Apollo Management VI, L.P.

43.    Pursuant to Section 3.1 of the LTIP, the LTIP was to be administered by the Board of Directors of CIL, or, if the board chose to delegate those duties, by whatever committee the Board of Directors appointed to administer the LTIP.

---

[8] Upon information and belief, CEVA hired a senior executive in finance during 2011 – 2012, who was required to make the mandatory co-investment.  After becoming aware of the financial state of the full CIL and CEVA debt transactions, the employee did not make the investment, and was subsequently fired for failing her refusal.

[9] *See* 2008 Global Equity Organization presentation attached hereto as Exhibit "6."  While the presentation notes that participation was not mandatory this is not the case.

44.     Upon information and belief, at some time between 2007 and 2008, the Board of Directors of CIL, pursuant to a written resolution of the Board and separate contract, delegated their LTIP administration duties to the Compensation Committee of CEVA Group, PLC., and as such, CEVA Group, Plc became responsible all duties owing to the Management Co-Investors under the LTIP, and for administering the LTIP.

45.     Among the provisions of the LTIP was an adjustment clause which stated the following:

> 10.1 Changes in Capital Structure.
>
> In the event of a stock dividend, stock split, reverse stock split, share combination, or recapitalization or similar event affecting the capital structure of the Company, an extraordinary cash dividend, issuance of equity securities at a material discount to fair market value, separation, spinoff or a reorganization (each, an "Adjustment Event"), the Committee or the Board shall make such substitutions or adjustments as it deems appropriate and equitable to: (A) the aggregate number and kind of Shares or other securities reserved for issuance and delivery under the Plan, (B) the number and kind of Shares or other securities subject to outstanding Awards; (C) performance metrics and targets underlying outstanding Awards; and (D) the Option Price of outstanding Options. In the event of a merger, consolidation, acquisition of property or shares, stock rights offering, liquidation, disaffiliation, or similar event affecting the Company or any of its Subsidiaries (each, a "Corporate Transaction"), the Committee or the Board shall make such substitutions or adjustments as it deems appropriate and equitable to: (A) the aggregate number and kind of Shares or other securities reserved for issuance and delivery under the Plan, (B) the number and kind of Shares or other securities subject to outstanding Awards; (C) performance metrics and targets underlying outstanding Awards; and (D) the Option Price of outstanding Options. In the case of Corporate Transactions, such adjustments may include, without limitation, (1) the cancellation of outstanding Awards in exchange for payments of cash, property or a combination thereof having an aggregate value equal to the value of such Awards, as determined by the Committee or the Board in its sole discretion (it being understood that in the case of a Corporate Transaction with respect to which shareholders of Common Stock receive consideration other than publicly traded equity securities of the ultimate surviving entity, any such determination by the Committee that the value of an Option shall for this purpose be deemed to equal the excess, if any, of the value of the consideration being paid for each Share pursuant to such

Corporate Transaction over the Option Price of such Option shall conclusively be deemed valid); and (2) the substitution of other property (including, without limitation, cash or other securities of the Company and securities of entities other than the Company) for the Shares subject to outstanding Awards.

10.2 Special Rules.

The following rules shall apply in connection with Section 10.1 above:

(a) No adjustment shall be made for cash dividends (except as described in Section 10.1) or the issuance to stockholders of rights to subscribe for additional Shares or other securities (except as described in Section 10.1); and

(b) Any adjustments referred to in Section 10.1 shall be made by the Committee or the Board in its discretion and shall, absent manifest error, be conclusive and binding on all Persons holding any Awards granted under the Plan.

46.     The LTIP also incorporated the CEVA Investments Limited Shareholder Agreement, also governed by Delaware law (attached hereto as Exhibit "7") by virtue of an Adoption Agreement incorporated into the LTIP.

47.     The CIL Shareholder Agreement also provided that Apollo Management VI, L.P. would act as the Management Co-Investors proxy, through an irrevocable proxy and power of attorney, a common practice for Apollo Management VI, L.P.  Indeed, Apollo's internal operating guidelines dictate that "[t]he Apollo Private Equity Managers have been delegated the authority to vote proxies regarding their Client accounts".  Further those guidelines provide that Apollo is required to have guidelines in place to protect shareholders in the event of a conflict of interest.  It is Apollo's policy that "[i]n each instance, when exercising their voting discretion, the Apollo Private Equity Managers seek to avoid any direct or indirect conflict of interest between their Clients and their voting decision."

## Subsequent Debt Transactions and IPO Preparation

48.     In 2007, sometime just after the "road show" to attempt to syndicate the debt, Apollo authorized CIL to issue "Payment in Kind" ("PIK") notes in the amount of €275,000,000

in order to fund a dividend to itself and the Management Co-Investors.  Management Co-Investors were requested to reinvest their dividend in lieu of a required third tranche of capital contributions by the Management Co-Investors.

49.     From the PIK note funds, Apollo received a dividend in the amount of approximately €165,325,000, recouping more than half of its initial capital contributions to the company.  Upon information and belief, Apollo used funds from the dividend to begin buying the debt of its portfolio companies.

50.     In the beginning of 2008, during the recessionary period beginning that began in the second half of 2007, Apollo formed special purpose vehicles to "to capitalize on the volatility in the credit markets" and invest in the debt of their portfolio companies managed by Apollo (the "Debt Co-Investment Vehicles"), including companies specifically managed by Apollo Management VI, L.P. [10]

51.     Upon information and belief, in early 2008, Apollo invested approximately $1 billion into distressed debt, including the debt of its portfolio companies (based upon its insider knowledge).  Mr. Leon Black explained in a letter that the investments would yield attractive returns. *See* Exhibit "8".

52.     Apollo has described these debt investments as having "an attractive return profile" in public filings and stated that becoming senior creditors is strategic to the interests of equity positions.  However, at no point in time did Apollo inform the Management Co-Investors that they believed that the interests of equity needed to be protected by investments in debt.

---

[10] According to a 2012 AP Alternative Assets, L.P. 2012 Financial Report, the identified portfolio companies whose debt was being purchased were CEVA Logistics, Claire's Stores Inc., Caesars Entertainment Corporation, Realogy Corp. and Momentive Performance Materials.  Notably, Apollo has put each of the above companies into Chapter 11 or an out-of-court restructuring and swapped its deeply discounted debt for equity.

53.     Upon information and belief, the debt investments in each portfolio company, including CEVA, have allowed Apollo and investors in the special purpose vehicles for that debt, to recoup in excess the equivalent of all capital contributions made to each portfolio company in equity, due to the debt being purchased at significant discounts to par value, the interest payments being made at par value, and through debt for equity swaps.

54.     In 2008, CEVA debt was being exchanged for €0.37 to the dollar, and upon information and belief, dropped significantly further below par value in the following months and years.

55.     Pursuant to an array of debt transactions detailed on the Irish Stock Exchange, beginning in 2007, Apollo acquired, and frequently traded and up-tiered, a significant amount of varied CEVA debt, along with the CIL PIK notes. This ensured that Apollo acquired secured higher tier debt, in necessary and strategic protection of its portfolio company equity, for when CEVA Group, CIL, other Apollo affiliates, and Apollo's institutional investors, eventually entered into the 2013 Transaction, Apollo came out on top, having made a significant amount of money off the debt, its interest payments, and still retained control of CEVA, and its new holding company, CEVA Holdings.  Upon information and belief, Apollo retains CEVA debt, and now CEVA Holdings debt, and these debt up-tiering transactions, by Apollo of that debt, have continued to this day.[11]

56.     In February of 2012, it was announced to the Management Co-Investors that Apollo had engaged in a debt-for-equity refinancing with CEVA and CIL.  The Management Co-Investors

---

[11] As a result of the acquisition of this debt, the interests of Apollo and the Management Co-Investors were no longer aligned.  While not disclosing this as a specific conflict of interest to Management Co-Investors, internally, Apollo recognizes such conflicts.   "Furthermore, Apollo Management or one or more of its affiliates may engage the same service provider to provide services to a Client that also provides services to Apollo Management or any such affiliate, which creates a potential conflict of interest to the extent the interests of such parties are not aligned."

were told that it would assist in preparing the company for an IPO, extended debt maturities until 2016, was a significant sign of Apollo's commitment to equity, and that appropriate adjustments would be made, as required by the LTIP.  Among the benefits described to the Management Co-Investors was an increase in the capability to grow the business, a reduction in risk to equity value, and quicker access to the IPO market. This corporate transaction also resulted in the issuance of certain Class B shares of CIL, owned by Apollo.

57.     On May 4, 2012, Apollo caused CIL to file a form F-1 with the Securities and Exchange Commission in anticipation of an IPO.  On August 29, 2012, Apollo caused CIL to file an amended F-1/A with the Securities and Exchange Commission.  One notable change between the original Form F-1 and Form F-1/A was a change to the majority shareholder of CIL, from AIF Euro Holdings, L.P. to AP VI CEVA Holdings, L.P.[12]

58.     At no time were the Management Co-Investors purposefully made aware of AP VI CEVA Holdings, L.P. acquisition of the majority of shares in CIL.

59.     On September 12, 2012, upon information and belief, at a meeting of CIL's Board of Directors, it was determined that the fair market value of the Class A Shares was still €50 per share, or approximately 60% of the value on the initial direct co-investments made by Management Co-Investors at the formation of NewCo.

**THE 2013 TRANSACTION**

60.     However, in the fall of 2012, Apollo became aware that it was going to shift strategies regarding the future of CEVA, forgo the IPO, and implement the 2013 Transaction.

---

[12] Upon information and belief, AP VI CEVA Holdings, L.P. is a special purpose vehicle created by Apollo, as discussed in paragraph 80, to hold the purchases of distressed debt of CEVA Group, and eventually become the controlling shareholder of CEVA Holdings, LLC.

61.     Indeed, on October 9, 2012, CEVA Group announced the imminent retirement of its CEO John Pattulo to be effective October 12, 2012, and that Marvin O. Schlanger would be replacing Mr. Pattulo. Upon information and belief, Mr. Schlanger was brought in with the specific purpose of effectuating the 2013 Transaction.[13]

62.     Upon information and belief, in October of 2012, CIL sought advice from the Walkers law firm ("Walkers") in the Cayman Islands regarding the fiduciary duties of its directors. Upon information and belief, Walkers also served as counsel to CEVA Group regarding the 2013 Transaction.

63.     However, on November 28, 2012, CEVA Group announced its 2012 third quarter results (the 2012 Q3 Financials). The Management Co-Investors were provided with the 2012 Q3 Financials during the fourth quarter of 2012.

64.     The Q3 2012 Financials stated:

> In preparing these unaudited condensed consolidated interim financial statements, the significant judgments made by management in applying the Group's accounting policies and the key sources of estimation uncertainty were the same as those that applied to the consolidated financial statements as at, and for, the year ended 31 December 2011.

65.     The Q3 2012 Financials also stated, "[t]he Group is in compliance with its covenant on its existing borrowings and believes that it has sufficient working capital and financing facilities and resources to service its operating activities for the foreseeable future.

66.     However, the 2011 Audited financial statements stated that CEVA Group had adequate resources to operate as a going concern.

---

[13] Mr. Schlanger remained the CEO of CEVA Group until the end of 2013, approximately 8 months after the consummation of the 2013 Transaction.  Upon the announcement of his retirement, he stated, "[w]hen I assumed the leadership position at CEVA, I had a number of immediate priorities to position the company for success in the future."

67.     According to IAFS 34, interim financial statements are to be prepared on the basis of a going concern, unless management believes that an entity can no longer qualify as a going concern.

68.     At the time that the Management Co-Investors were provided with the Q3 2012 Financials, Apollo and CEVA Group were fully aware that they no longer considered CEVA Group or CIL to be a going concern.

69.     Indeed, Apollo Management VI, L.P., in its role as manager to the Apollo Shareholders, pursuant to a separate partnership agreement, upon information and belief, was in possession of financial statements of CIL that were significantly different in disclosures regarding the health of the CIL and CEVA.

70.     Additionally, after the release of the 2012 Q3 Financials, the Management Co-Investors were informed in a quarterly update that the value of their investments stood at approximately €50 per share.

71.     Likewise, upon information and belief, Gareth Turner ("Turner") and Mark Beith ("Beith"), both directors of CIL, also were seeking counsel with regards to the 2013 Transaction from the law firm of Mintz Levin in New York City (who also represented Apollo Global) and the Appleby law firm in the Cayman Islands ("Appleby") on behalf of CIL.  Upon further information and belief, Appleby was formally retained by CIL in December of 2012.

72.     Furthermore, upon additional information and belief, in February of 2013, counsel for CEVA Group advised Beith and Turner as to the details of the planned 2013 Transaction wherein CIL and its directors would allow CEVA Group to issue new shares to CEVA Holdings, essentially transferring all equity of CEVA Group held by CIL to CEVA Holdings for no consideration.

73.    Mintz Levin as, counsel to CIL, wrote, "[t]he problem is that CEVA has asked CIL to undertake certain actions, not the other way around.  We are happy to do it, but neither CIL nor its directors wants to take the chance of incurring liability for having complied with [CEVA Group's] requests."

74.    Indeed, Appleby, as counsel for CIL warned "[i]t is important to take all steps to avoid shareholder complaint that the whole process … is just a part of an Apollo Group stitch up, for its own purposes, pushed through at CIL level by Apollo controlled votes, in disregard of the interest of the CIL shareholders."   Upon information and belief, Appleby was referring to the Management Co-Investors, as Apollo Global had majority ownership and control of CIL.

75.    Upon information and belief, Apollo Global, acting in conjunction with Apollo, CIL, and CEVA representatives, continued with their plan for the 2013 Transaction despite the acknowledged conflict issues.   Specifically, counsel for CIL, Mintz Levin, expressed dissatisfaction with a then current draft of the 2013 Transaction proposal as "it was an excellent internal roadmap" but was "too forthcoming about our goals, our strategy, and some of our alternatives[,]" and that "this document could conceivable end up in front of a court some day and I want to give off an appearance the we are operating at an arms' [sic]  length basis."

76.    In an effort to effectuate the 2013 Transaction and give the appearance of an arm's-length transaction, Defendants began actively planning resignations of multiple directors of CEVA Group and CIL.  On or about January 15, 2013, two directors of CIL, Rubin McDougal and Dawn Wetherall, resigned from CIL's board while maintaining senior level positions of executive leadership in other CEVA entities, thus leaving Beith and Turner as the only directors of CIL, with both Beith and Turner retaining senior positions at Apollo, CIL's majority shareholder.  Likewise, Turner resigned as a director of CEVA Group on or about January 15, 2013, while likewise

retaining his position at Apollo.  Upon information and belief, Mintz Levin provided advice to and drafted the resignation letters for the directors, while at the same time purporting to advise CIL.

77.     Aware of, and concerned with, Turner's and Beith's conflicts, on or about February 22, 2013, Mintz Levin counseled Turner and Beith to create an illusion that would make it appear as if they were independently evaluating the 2013 Transaction proposal.   Specifically, an attorney at Mintz Levin determined that Turner and Beith could deem an ad hoc phone discussion to constitute a meeting of CIL's board and stated, "[n]o need for Mark [Beith] to call the meeting to order – we will just deem it so.  We will keep minutes.  They will reflect that we asked CEVA and professionals to make a presentation" and further advising CIL to "tell them that we will respond in a week, so as not to give the impression that we are just rubber stamping, even if we are in favor of their plan."

78.     Upon information and belief, Apollo and CEVA Group gave a presentation regarding the proposed 2013 Transaction to certain of its creditors, who were also institutional investors with Apollo, proposing to extinguish the equity of the Management Co-Investors and Apollo Global, in a debt for equity swap.   No information regarding the then-proposed 2013 Transaction was provided to the Management Co-Investors.

79.     Further, upon information and belief, on February 21, 2013, counsel for CEVA Group advised Mintz Levin, who was acting as counsel for CIL, to file a provisional liquidation of CIL in the Cayman Islands.

80.     Additionally, in late of February 2013, Mintz Levin stated, we need to consider the ramifications, if any, of a vote by Apollo without any notice or meeting in a process that will ultimately benefit Apollo at the CEVA level while wiping out the equity interest of all other shareholders at the CIL level."

81.     Upon information and belief, Apollo Management VI, L.P. effectuated the vote on behalf of the Management Co-Investors without notice or safeguards as to their conflicted status.

82.     On March 18, 2013, Mintz Levin sent an email to Beith and Turner stating, "[w]ith all the meddling by CEVA and Akin, we are getting to the point where we cannot even suggest there is any separateness between CIL and CEVA [Group], even if there was any to begin with."

83.      Upon information and belief, on March 28, 2013, Apollo Global caused CEVA Holdings to be created as a new entity in the Marshall Islands.

84.     On April 1, 2013, CEVA Group, Louis Cayman (the holder of .01% of CIL shares), CEVA Holdings, and CIL entered into an agreement (the "2013 Restructuring Agreement") by which CIL agreed to allow CEVA Group to issues shares to CEVA Holdings so as to dilute CIL's ownership of CEV Group to .01%.  The 2013 Restructuring Agreement referred to this part of the 2013 Transaction as the "Recapitalization."

85.     Likewise, on April 1, 2013, Beith and Turner at the request of Apollo Global, caused "CEVA Investments Limited" to have its name changed to "CIL Limited." [14]

86.     On April 26, 2013 CEVA Group filed a statement of capital following an allotment of shares with the UK Companies House, wherein it detailed that the Recapitalization as defined in the 2013 Restructuring Agreement had occurred on April 16, 2013.

87.     Upon information and belief, on April 2, 2013, Beith and Turner caused CIL to file for a provisional liquidation in the Cayman Islands, filing under an anonymous name of ABC Limited. [15]

---

[14] Prior to this name change, when LouisTopco changed its name to Ceva Investments Limited, Management Co-Investors were provided notice of the proposed name change and impending vote, and were provided with proxy voting forms by Apollo Management VI, L.P.  This did not occur.

[15] On May 13, 2013 date, CIL agreed to an involuntary Chapter 7 Proceeding in the Southern District of New York Bankruptcy Court. Management Co-Investors were never provided notice of this proceeding, despite the Special

88.     Additionally, upon information and belief, on April 2, 2013, Defendants caused CIL to withdraw its IPO with the SEC.

89.     On April 3, 2013, CEVA Group, Apollo Global, and certain of CEVA Group's debt holders who were also Apollo institutional investors, entered into a Restructuring Support Agreement ("RSA") to effectuate the 2013 Transaction.

90.     Upon information and belief, Apollo Management VI, L.P., as manager to the Apollo affiliates and Apollo Shareholders engaging in the 2013 Transaction, exercised complete dominion and control over the negotiations contemplated by the RSA.

91.     On or about April 4, 2013, CEVA Group issued a report to its bondholders (the "Bondholder Report") that detailed and stated the following:

a.  Beith and Turner as directors of CIL held interests in entities that were creditors of CEVA, and as such were able to participate and benefit from the planned 2013 Transaction;

b.  After extensive arm's-length negotiations, a settlement was reached of CIL's intercompany claims against CEVA Group, which entailed, among other things, "CEVA [Group], CIL, Ceva Holdings, LLC, and Louis Cayman Second Holdco Limited enter[ing] into a Restructuring Agreement pursuant to which […] CIL agree[ing] to allow [CEVA Group] to issue new shares[;]" and

c.  "CEVA [Group] and CIL believe that this compromise and settlement of the CIL Intercompany Claim, as part of the overall compromise and settlement between CEVA [Group] and CIL regarding the issuance of shares by CEVA [Group] to facilitate the Restructuring, fairly and appropriately resolves the

_____

Counsel for the Trustee acknowledged that the Management Co-Investors were potentially at conflict with the estate, thus having potential claims against the Estate.

potential risks of litigation regarding the CIL Intercompany Claim, is a good

faith compromise, and is reached after arms' length negotiations. The

settlement and compromise was approved by each of the Boards of Directors

of CEVA [Group] and CIL, which were both independently advised by

separate legal and financial advisors. The Boards of Directors of CEVA

[Group] and CIL consist of no members that are members of the other Boards

of Directors."

92.    However, it is clear that the 2013 Transaction was not an arm's length transaction,

was not a disinterested transaction, as members of the Board of CIL and Board of CEVA Group,

along with Apollo as the manager of the Apollo Shareholders as majority controlling shareholders,

stood on both sides of the 2013 Transaction.

93.    Moreover, pursuant to a statement of affairs of CIL as of May 15, 2013, the Apollo

Shareholders no longer held any Class A shares of CIL as they had on March 30, 2013 but had

maintained their Class B shares in CIL.   The details of the transaction that resulted in the

extinguishment of the Apollo Shareholders Class A shares are unknown.

94.    On or about April 5, 2013, the Management Co-Investors were sent correspondence

from CIL, alternatively defined in the April 5, 2013 correspondence as "Holdco." The

correspondence stated in relevant part:

> As you likely know, the principal investment of Holdco is its direct
> and indirect shareholding in its subsidiary company, CEVA Group
> Plc ("CEVA").  The directors of Holdco have received advice from
> valuation and restructuring professionals that Holdco's
> shareholding in CEVA is now without value, in consequence of the
> financial condition of CEVA.
>
> You may have seen, or shortly will see, press announcements
> concerning the proposed restructuring of CEVA […].

> In light of Holdco's and CEVA's financial condition, we have been advised that it is unlikely that there will be any recoveries for shareholders of Holdco in their capacities as shareholders. The Directors regret having to write to you with this information.

95.     However, pursuant to the LTIP, there was an opportunity for recovery pursuant to the Management Co-Investors status as Plan Participants, who were owed an equitable adjustment in the event of "Corporate Transactions" of CIL or any of its subsidiaries, i.e., CEVA Group.

96.     The LTIP required equitable adjustments in the event that CIL or CEVA Group entered into corporate transactions such as the 2013 Transaction, and specifically contemplated that this equitable adjustment could be paid in cash.

97.     It was announced to some Management Co-Investors in June of 2013, subsequent to the filing of the CIL involuntary Chapter 7, that as a result of the 2013 Transaction being fully consummated, they were being awarded a cash award in the amount equal to 60% of their net cumulative investments in CIL.

98.     Upon information and belief, a number of Apollo appointed board members of CEVA Group held extensive shares in CIL under the LTIP as well.

99.     Indeed, pursuant to the Restructuring Support Agreement, it was intended that the Cash Award could be utilized so that Management Co-Investors would be able to purchase up to 12% of the fully diluted shares of CEVA Holdings under a plan.  The Cash Award, however, was independent of the new long-term incentive plan.

100.    CEVA's Chief Executive Officer at that time Marvin Schlanger stated, "[t]he company was put in the position of having to restructure. The initial equity was then included. Apollo, the executive board, me, the management – we all lost our equity. We recognize that's very unfortunate, and something that doesn't make anyone happy. To recover from that, we have

given people the opportunity to participate in a new equity plan. If the company performs, they can earn as much or more than their initial investment. We think we've treated everyone fairly."

101.    Some management investors did receive 60% percent of their net cumulative investments in CIL, the approximate value of the shares just prior to the 2013 Transaction.

102.    Other Management Co-Investors received 60% of their net cumulative investments in CIL minus any monies they reinvested from dividends received.

103.    However, Michael McEvoy, along with a significant number of other Management Co-Investors did not receive the required adjustment pursuant to the LTIP, nor notice of the adjustment.

104.    It is unknown how these differing adjustments made pursuant to the terms pursuant to the LTIP were negotiated, nor how these Cash Award were valued for Management Co-Investors who were provided the Cash Award.

105.    None of the Management Co-Investors received any further notice regarding the Cayman liquidation proceedings, nor notice of the CIL involuntary Chapter 7 proceeding.

106.    Despite the representations of Mr. Schlanger, not every Management Co-Investor was treated fairly, or in the same manner.  As such, the Management Co-Investors have suffered damages, on their cumulative net investments, subject to appropriate adjustments, of approximately €30,000,000.

107.    Given that the Defendants participation in negotiating the 2013 Transaction was not independent, disinterested, or conducted at arms-length, all claims arising herein are governed by the entire fairness doctrine under Delaware law.

## CAUSES OF ACTION

## COUNT I – Violation of the Investment Advisors Act of 1940

**(Against Apollo Management VI, L.P.)**

108.    This cause of action is being brought pursuant to 15 U.S.C. §§ 80b.

109.    Plaintiff hereby reincorporates paragraph 1 – 107 of this Amended Complaint.

110.    Pursuant to 15 U.S.C. § 80b, investment advisors owe a fiduciary duty to their clients which includes an obligation to act in the best interests of McEvoy and the Management Co-Investors, with undivided loyalty and good faith.

111.    Additionally, 15 U.S.C. 80-b6 also states the following:

> It shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—
>
> (1)     to employ any device, scheme, or artifice to defraud any client or prospective client;
> (2)     to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;
> (3)     acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; or
> (4)     to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

112.    Apollo Management VI, L.P. acted as an investment advisor to all special purpose vehicles invested in the portfolio companies acquired by Apollo Investment Fund VI, L.P, including the LTIP as special purpose vehicle for Management Co-Investors.

113.    Apollo Management VI, L.P. failed to inform the Management Co-Investors that it no longer reasonably believed that any equity positions in portfolio companies, including CIL and CEVA, were secure unless it was backed by add on direct co-investments in the portfolio company debt.

114.    At no time did Apollo Management VI, L.P. propose to allow Management Co-Investors to participate in direct co-investments of CEVA debt, despite the investment advisor deeming it necessary to do so.

115.    However, Apollo Management VI, L.P. provided this recommendation, advice, and opportunity to other Apollo affiliates, partners, and institutional investors.

116.    Additionally, despite Apollo Management VI, L.P., representing the interests of the Apollo affiliates in negotiating the 2013 Transaction, Apollo failed to represent the interests of the Management Co-Investors, by negotiating for all Management Co-Investors to receive the same treatment under the Cash Award that was given as an adjustment in the 2013 Transaction.

117.    Indeed, Apollo Management VI, L.P. concocted a scheme, so as to deceive the Management Co-Investors, by holding a vote without notice, despite their proxy obligations, and obfuscating the nature of and negotiations of the 2013 Transaction so as to not alert Management Co-Investors of the determination that an adjustment was warranted and would be awarded under the 2013 Transaction.

118.    As a result of these acts, the Management Co-Investors have been damaged.

### COUNT II – Breach of Fiduciary Duty
**(Against Apollo Global Management, LLC,
and Apollo Management VI, L.P)**

119.    Plaintiff hereby reincorporates paragraphs 1 – 107 of the Amended Complaint.

120.    Plaintiff brings this action under the laws of the State of Delaware.

121.     Apollo Global Management, LLC and Apollo Management VI, L.P. formed a partnership with the Management Co-Investors by virtue of the nature of the mandatory co-investments, necessary to effectuate the long term operational goals of CEVA Logistics, as is alleged herein.

122.     As Partners with the Management Co-Investors, Apollo Global Management, LLC and Apollo Management VI, L.P. owed a duty of care and loyalty to McEvoy and the other Management Co-Investors.

123.     Apollo Management VI, L.P., and Apollo Global Management, LLC, in negotiating the 2013 Transaction, failed to negotiate the required adjustment under the LTIP owed to McEvoy and the other Management Co-Investors, and therefore breached their duties owed to the McEvoy and the other Management Co-Investors.

124.     As such, McEvoy and the other Management Co-Investors have been damaged.

## COUNT III – Breach of Fiduciary Duty
### (Against Apollo Management VI, L.P. as Sponsor of the LTIP)

125.     Plaintiff hereby reincorporates paragraphs 1 -107 of the Amended Complaint.

126.     Plaintiff brings this action under the laws of the State of Delaware.

127.     Apollo Management VI, L.P., as Sponsor of the LTIP, owed a duty of care and loyalty to McEvoy and the other Management Co-Investors.

128.     Apollo Management VI, L.P., as Sponsor of the LTIP, in negotiating the 2013 Transaction, failed to negotiate the required adjustment under the LTIP owed to the Management Co-Investors, and therefore breached its duties owed to McEvoy and the other Management Co-Investors.

129.     As such, McEvoy and the other Management Co-Investors have been damaged.

## COUNT IV – Breach of Fiduciary Duty

**(Against CEVA Group, Plc, as the LTIP Administrator)**

130.    Plaintiff hereby reincorporates paragraphs 1 -107 of the Amended Complaint.

131.    Plaintiff brings this action under the laws of the State of Delaware.

132.    CEVA Group, Plc, as administrator of the LTIP, owed a duty of care and loyalty to McEvoy and the other Management Co-Investors.

133.    CEVA Group, Plc, in negotiating the 2013 Transaction, failed to negotiate the required adjustment under the LTIP owed to McEvoy and the other Management Co-Investors, and therefore failed to negotiate the required adjustment under the LTIP owed to McEvoy and the other Management Co-Investors, and therefore breached their duties owed to McEvoy and the other Management Co-Investors.

134.    As such, McEvoy and the other Management Co-Investors have been damaged.

**COUNT V – Breach of Contract**
**(Against CEVA Group, Plc as LTIP Administrator)**
**(In the Alternative)**

135.    Plaintiff hereby reincorporates paragraphs 1 - 107 of the Amended Complaint.

136.    Plaintiff brings this action under the laws of the state of Delaware.

137.    The Compensation Committee of CEVA Group, Plc was responsible for administration of the LTIP.

138.    By failing to provide the required adjustment to McEvoy and the other Management Co-Investors in the 2013 Transaction, CEVA Group, Plc breached the LTIP.

139.    As a result of the breach of the LTIP, McEvoy and the other Management Co-Investors have been damaged.

**COUNT IV**
**(Declaratory Judgment regarding Partnership/Joint Venture)**

140.     This request for Declaratory Judgment is brought pursuant to 28 U.S.C. § 2201.

141.     Plaintiff hereby reincorporates paragraphs 1 – 107 of the Amended Complaint.

142.     An actual controversy has arisen and exists between the parties as to whether the allegations contained herein establish the existence of a Partnership or Joint Venture between the Management Co-Investors and Apollo Global Management, LLC and Apollo Management VI, L.P.

143.     Plaintiff seeks a declaration that Apollo Management VI, L.P. and Apollo Global Management, LLC formed a Partnership or Joint Venture, with the Management Co-Investors, to determine the status, rights and privileges potentially arising from such Partnership or Joint Venture.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Michael McEvoy, on behalf of himself and all others similarly situated, prays for relief pursuant to each Count set forth in the Complaint as follows:

1.   For an order certifying that this action may be maintained as a class action, certifying Plaintiff as representative of the Class, and designating his counsel as counsel for the class;

2.   For specific performance, compensatory and punitive damages to be determined at trial;

3.   For an award of costs; and

4.   For any other relief the court might deem just, appropriate, or proper.

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury on all issues so triable.

Respectfully submitted this ___ day of December, 2018.

**JOHN D. WEBB, P.A.**

_____

John D. "Jack" Webb
Florida Bar Number: 0051871
34 Cordova Street
St. Augustine, Florida 32084
Telephone: (904) 803-4686
Primary Email:
jwebb@jackwebblaw.com
Secondary Email:
arichey@jackwebblaw.com