# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MICHAEL MCEVOY, on behalf of
himself and others similarly
situated,

     Plaintiff,

v.                                                                    Case No. 3:17-cv-891-TJC-MCR

APOLLO GLOBAL
MANAGEMENT, LLC, a Delaware
limited liability company, APOLLO
MANAGEMENT VI, L.P., a
Delaware limited partnership, and
CEVA GROUP, PLC,

     Defendants.

---

## AMENDED ORDER[1]

     This putative class action is before the Court on Defendants Apollo Global

Management, Inc. (f/k/a Apollo Global Management, LLC), Apollo Management

VI, L.P. (collectively, "Apollo"), and CEVA Group PLC's ("CEVA Group") Motion

for Summary Judgment. Doc. 95. Plaintiff Michael McEvoy filed a response.

Docs. 112, 116. The Court previously converted Defendants' motions to dismiss

to a motion for summary judgment and ordered limited discovery on the issue

---

[1] This Order vacates Doc. 122, published on Westlaw as <u>McEvoy v. Apollo Glob. Mgmt., LLC</u>, No. 3:17-CV-891-TJC-MCR, 2021 WL 2661006, at *1 (M.D. Fla. June 29, 2021).

of the statute of limitations only. Doc 80. Following the Court's Order denying the Motion, Doc. 122, the Defendants filed a Joint Limited Motion for Reconsideration of Order Denying Motion for Summary Judgment. Doc. 125. Plaintiff Michael McEvoy has responded. Doc. 128. Defendants have filed a Reply. Doc. 131. McEvoy has filed a Sur-Reply. Doc. 134. The Court has determined to vacate its order denying the Motion for Summary Judgment, Doc. 122, and replace it with this Order granting summary judgment.

## I.    BACKGROUND

### A.    CEVA's Formation and 2013 Restructuring

Plaintiff Michael McEvoy began working at Ryder Truck Lines in 1972. Doc. 96-1 at 17:15–18:9. He soon transitioned to a company called Customized Transportation, which was acquired by CSX, which in turn was sold to TNT Logistics, which Apollo purchased and merged with EGL, Inc. to form CEVA Logistics in 2006. Id. at 18:7–19:4. CEVA Logistics is a subsidiary of CEVA Group, a global freight management and supply chain logistics company. Doc. 97 at 1–2. CEVA Group itself was 99.9 percent owned by CEVA Investments Limited ("CIL"), a Cayman Islands corporation, until 2013. Id. at 2. Apollo "held the vast majority of CIL's preferred and common shares . . . ." Id. at 3.

Upon CEVA Logistics' formation, management-level employees from TNT and EGL, including McEvoy ("Management Investors"), were asked to purchase

equity in the Cayman Islands company that became CIL. Doc. 96-1 at 30:18–20. They did so through a fund called the 2006 Long-Term Incentive Plan ("2006 LTIP"). Id. at 23:2–6. The investment was to "increase [directors and employees'] personal interest in [CIL's] growth and success . . . ." Doc. 96-2 at 3. McEvoy invested approximately $10,000 in the 2006 LTIP. Doc. 96-1 at 23:6. He received and reviewed the 2006 LTIP Agreement when he invested. Id. at 28:22–29:6.

According to Marvin Schlanger, the Chief Executive Officer of CEVA Group from 2012 to 2014, facing financial problems in "mid-2012 into 2013," "CEVA Group's management determined that CEVA's only choice for survival was a financial restructuring." Doc. 97 at 2. In April 2013, CEVA Group performed a "major debt-for-equity exchange" ("2013 Transaction"). Id. CEVA Group converted much of CIL's debt into equity ownership of a new entity called CEVA Holdings, LLC ("CEVA Holdings"), diluting CIL's ownership of CEVA Group. Id. The transaction led to the de-valuation of CIL's ownership of CEVA Group from 99.9 percent to .01 percent, effectively wiping out all previous investment in CIL, including the 2006 LTIP shares' value. Id. On April 2, 2013, CIL entered provisional liquidation proceedings in the Cayman Islands. Doc. 98 at 1. According to Schlanger's declaration, "[n]o CIL shareholder, including [Apollo]. . . recovered anything on account of their investment in CIL in the 2013

Restructuring or thereafter," and a "collateral but inevitable consequence of the 2013 Transaction was the dissolution" of the 2006 LTIP. Doc. 97 at 2–3.

### B.   CIL's Communications to McEvoy

In December 2012, CEVA Logistics informed McEvoy that due to general cutbacks, he would be laid off in March 2013. Doc. 96-1 at 24:14–18. He exercised his put rights to sell his 2006 LTIP shares at their present value on January 21, 2013, and was informed the following day that CEVA could purchase them back on April 1, 2013, and that their most recent value was approximately €50 per share. Doc. 112-35 at 5–6. His last day at CEVA was March 31, 2013. Id. at 7. CEVA Logistics temporarily re-hired him as an independent contractor from October through December 2013 to help start a new logistics contract. Doc. 96-1 at 136:20–37:16, 137:23–25.

CIL informed McEvoy of the 2006 LTIP dissolution and CIL's lack of value via registered letter dated April 5, 2013, stating that "[t]he directors of [CIL] have received advice from valuation and restructuring professionals that [CIL's] shareholding in CEVA is now without value, in consequence of the financial condition of CEVA. You may have seen, or shortly will see, press announcements concerning the proposed restructuring of CEVA." Doc. 96-3 at 2. The letter further stated that "[i]n light of [CIL's] and CEVA's financial condition, we have been advised that it is unlikely that there will be any recoveries for shareholders of [CIL] in their capacities as shareholders." Id. at 3.

CIL sent another letter announcing the appointment of Joint Provisional Liquidators ("JPLs") as part of the Cayman Islands liquidation proceedings on April 8, 2013. Doc. 98-1. On April 17, 2013, the JPLs sent a letter to twenty to thirty Management Investors who had contacted the JPLs with questions. Doc. 112-29 at 125. The document has a question and answer section on CIL's condition and the 2006 LTIP, confirming to Management Investors that the company had no value, and that "no alternative investment is being offered to the [s]hareholders, nor is there any exchange offer being offered to the [s]hareholders." Doc. 98-2 at 4. The letter explained that the liquidation was performed "pursuant to the irrevocable proxy and power of attorney granted to Apollo Management VI, L.P." in the 2006 LTIP Agreement. Id. at 3. Schlanger instructed the attorneys drafting the letter to exclude "reference to any new equity plans . . . [because the] letter [would be] going to a lot of people who no longer are with the Company and have nothing to do with any new plans." Doc. 97-7 at 3. This was, he explained in his declaration to the Court, to avoid creating an "impression that those former employees were eligible to participate in the 2013 CEVA Holdings LTIP" (discussed below). Doc. 97 at 6. While McEvoy does not recall reading the question and answer document, he received an email with an identically named attachment. Doc. 96-1 at 88:23–90:1.

The JPLs sent another letter on June 14, 2013 informing Management Investors that CIL was insolvent, listing the names of the Management

5

Investors who had been represented as part of the bankruptcy proceedings, and stating that there was an involuntary Chapter 7 bankruptcy proceeding taking place against CIL in the Southern District of New York. Docs. 98-3; 112-39.

On March 4, 2014, McEvoy corresponded with the JPLs, now the Joint Official Liquidators, asking for documentation that his "investments [were] worthless" for "US tax purposes." Doc. 98-4 at 4. They confirmed with documentation, and McEvoy claimed a $10,000 loss in his tax returns for 2013. Docs. 96-7 at 2; 98-4.

Between 2013 and 2015, McEvoy discussed his investment in the 2006 LTIP multiple times. In 2013 he had a "casual conversation" with a friend who was an attorney who advised him not to pursue a case against CEVA. Doc. 96-1 at 69:19–71:2, 121:19–21. In June 2015 he discussed losing the value of his investment in the 2006 LTIP at lunch with two former CEVA employees who themselves had not invested in the LTIP. Id. at 44:11–14, 49:1–8. On October 3, 2015, he discussed his financial loss with a different individual who had invested in the 2006 LTIP and was still employed at CEVA, though he did not recall discussing any potential re-investment or pending litigation against the company. Id. at 38:3–5, 39:9–21, 40:17–41:12.

## C.   The 2013 LTIP

According to Schlanger, in order to "take steps to try and maintain morale at the company," the newly-formed CEVA Holdings "developed a new incentive

program, which was formally adopted as the 2013 CEVA Holdings LTIP" ("2013 LTIP"). Doc. 97 at 3. CEVA employees with ranks of M-4 and higher received restricted stock options and penny stock options, and those ranked M-3 and below received cash awards. Id. The cash awards were in amounts "equal to 60% of [eligible] employees' prior net cumulative investments in CIL and vested over a five-year period." Doc. 97 at 4. The President of CEVA Americas instructed management to "not be shy of reminding [Management Investors] that their equity has been converted into new plans." Doc. 112-12 at 2 (emphasis in original).

### D.   Litigation and Public Statements

Three of CIL's unsecured debtholders filed an uncontested involuntary Chapter 7 petition against CIL in the United States Bankruptcy Court for the Southern District of New York on April 22, 2013, which the Bankruptcy Court granted, appointing a Chapter 7 Trustee ("Trustee"). In re CIL Ltd., 582 B.R. 46 (Bankr. S.D.N.Y. 2018), amended on reconsideration, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018) ("Bankruptcy Proceeding"). On December 8, 2014, the Trustee filed a complaint in the Bankruptcy Proceeding alleging that Apollo orchestrated a fraudulent transfer of CIL's interest in CEVA Group to CEVA Holdings without consideration, naming CIL directors Gareth Turner and Mark Beith, CEVA Group, and CEVA Holdings as defendants. Doc. 96-11. The complaint alleged that the directors "orchestrated

7

and authorized a secretive recapitalization of CEVA that erased the value of CIL's shares of CEVA . . . ." Id. at 3. On March 31, 2015, the Trustee filed an Amended Complaint in the Proceeding. Doc. 96-12. Creditors also filed direct claims against CEVA Logistics AG in the Supreme Court of the State of New York County of New York in 2019. Doc. 121 at 1, 2.

CEVA Holdings' Third Quarter Interim Financial Statements, released November 18, 2013, announced that "[a] new management equity plan" including cash compensation "replaced the previous plan that was administered by CIL Limited and cancelled as part of the Recapitalization." Doc. 97-4 at 23. CEVA Holdings' 2013 Annual Report, released on February 28, 2014, also discussed the plan. Doc. 97-6 at 14–15.

CEVA's Management Investors' losses were discussed in some news articles. The Loadstar, an U.K.-based logistics news source founded in 2012, published an article on Management Investors' losses due to the 2013 Transaction on August 19, 2013. Doc. 72-2. Titled "CEVA staff say they were 'press-ganged' into investment that lost them thousands," the article stated that Management Investors had invested between €10,000 and as much as €400,000, had felt pressured to invest in the 2006 LTIP, and that some had recovered 60 percent of their investment under a new equity scheme. Id. at 2–4. The article mentioned that some investors and lenders were considering or involved in litigation in the Cayman Islands and New York. Id. at 1, 2. The article quoted

8

Schlanger stating that "we have given people the opportunity to participate in a new equity plan. If the company performs, they can perform as much or more than their initial investment. We think we've treated everyone fairly." Doc. 72-2 at 3. The Loadstar published another article on September 9, 2015, headlined "'Wiped-out' CEVA investors win court hearing over alleged fraud . . ." discussing the Bankruptcy Proceeding and printing the same quote from Schlanger. Doc. 96-14 at 2. On September 11, 2015, the New York Post published an article entitled "Astros owner getting results on and off the field," which focused on an individual who lost a bidding war on EGL to Apollo. Doc. 96-15 at 2. The article highlighted Apollo's behavior in the EGL acquisition, saying that "ex-employees now say they were pressured to roll over much of their proceeds from the sale of EGL into Apollo-controlled Ceva under threat of losing their jobs," and that those same employees were contemplating legal action against Apollo. Doc. 96-15 at 3.

### E.   McEvoy's Original Complaint and New York Bankruptcy Court-Imposed Stay

On August 3, 2017, McEvoy filed a putative class action lawsuit ("Original Complaint") in this Court against Apollo Global Management, Turner, and Beith for losses, alleging self-dealing and fraudulent conversion. Doc. 1. The Trustee filed a motion in the New York Bankruptcy Court to enjoin McEvoy's case on October 18, 2017, arguing the claims McEvoy asserted were derivative

9

claims that were property of CIL's estate. In re CIL Ltd., No. 13-11272-JLG, 2018 WL 878888, at *1 (Bankr. S.D.N.Y. Feb. 9, 2018). The Bankruptcy Court agreed, declaring McEvoy's putative class action in this Court "null and void ab initio." Id. at *12. McEvoy moved the Bankruptcy Court to permit him to amend his complaint to assert direct claims, proposing an amended complaint that excluded defendants Turner and Beith and added defendants CEVA Group and Apollo Management VI. Doc. 31 at 4. On October 16, 2018, the New York Bankruptcy Court allowed McEvoy to file the proposed amended complaint in this proceeding. Doc. 31-2.

On December 7, 2018, McEvoy filed the Amended Class Action Complaint in this Court ("Amended Complaint"), alleging total losses of approximately €30,000,000.[2] Doc 35. In addition to naming new defendants, the Amended Complaint alleges a new injury: that the named Defendants caused putative class members "to not receive, or not equally receive, a required adjustment" as part of CEVA's 2013 restructuring. Id. ¶ 15. The Amended Complaint raised one claim under the Investment Advisors Act that the Court has already dismissed. Doc. 80.

---

[2] With leave of the Court, McEvoy filed a Second Amended Complaint on July 23, 2021 that alleged that Defendants "were engaged in actual self-dealing" and fraudulently concealed the nature of the re-structuring and 2013 LTIP from the Management Investors. Doc. 124, ¶¶ 108–122. The new allegations in the Second Amended Complaint do not alter the Court's analysis.

## II.    ANALYSIS[3]

### A.    Statute of Limitations

Under the terms of the 2006 LTIP Agreement, Delaware law governs this dispute. The applicable statute imposes a three-year limitations period on claims for breach of fiduciary duty. DEL. CODE ANN. tit. 10, § 8106.[4] "The general law in Delaware is that the statute of limitations begins to run, i.e., the cause of action accrues, at the time of the alleged wrongful act, even if the plaintiff is ignorant of the cause of action." In re Dean Witter P'ship Litig., No. CIV. A. 14816, 1998 WL 442456, at *4 (Del. Ch. July 17, 1998), aff'd, 725 A.2d 441 (Del. 1999). The Court determines that for the purposes of the statute of

---

[3] On a motion for summary judgment, the Court cannot weigh evidence, but rather can only rule on undisputed facts in the record. When a motion for summary judgment is based on a statute of limitations, "the moving party must establish that 'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party' on the timeliness issue." 100079 Canada, Inc. v. Stiefel Lab'ys, Inc., 954 F. Supp. 2d 1360, 1368 (S.D. Fla. 2013), aff'd, 596 F. App'x 744 (11th Cir. 2014) (quoting Ashcroft v. Randel, 391 F. Supp. 2d 1214, 1219 (N.D. Ga. 2005)). "Summary judgment may not be granted when the record indicates a material fact is in dispute or if it seems desirable to inquire more thoroughly into the facts in order to clarify the application of law to the circumstances." Eluv Holdings (BVI) Ltd. v. Dotomi, LLC, C.A. No. 6894-VCP, 2013 WL 1200273, at *4 (Del. Ch. Mar. 26, 2013).

[4] Whether the limitation is addressed under the statute of limitations or the doctrine of laches generally leads to the same result under Delaware law. See Kraft v. WisdomTree Invs., Inc., 145 A.3d 969, 973–76 (Del. Ch. 2016) (explaining the application of the statute of limitations or laches in the Delaware Court of Chancery, and noting that courts generally apply the statute of limitations by analogy to cases where laches applies).

limitations, McEvoy's cause of action alleged in the Amended Complaint accrued under Delaware law on June 11, 2013, the date the 2013 LTIP became effective.[5] Doc. 97-6 at 14–15. Absent tolling, the limitations period expired on June 11, 2016.

Because the New York Bankruptcy Court declared the Original Complaint void <u>ab initio</u>, Defendants argue that the filing date for limitations purposes is that of the Amended Complaint, December 7, 2018. (Doc. 95 at 17 n.82). McEvoy argues that because the New York Bankruptcy Court permitted him to amend, the operative date of filing should be that of the Original Complaint on August 3, 2017.

Whether or not the Original Complaint is void, the claims raised in the Amended Complaint do not relate back. This Circuit views "Rule 15(c)(1) as incorporating state law relation-back rules when the law of that state provides the statute of limitations for an action." <u>Saxton v. ACF Indus., Inc.</u>, 254 F.3d 959, 963 n.6 (11th Cir. 2001). Under Delaware law, new arguments of law relate back, but new facts generally do not. See <u>Cent. Mortg. Co. v. Morgan Stanley</u>

---

[5] <u>See</u> ¶ 15 of the Amended Complaint, which claimed that Defendants "caused members of the Management Co-Investors to not receive, or not equally receive, a required adjustment during the 2013 Transaction." Doc. 35. Defendants may be correct that McEvoy "mistakenly" alleges that the 2013 LTIP was an adjustment to the 2006 LTIP, Doc. 95, but whether or not this was the case is not at question in this Motion.

Mortg. Cap. Holdings LLC, No. 5140-CS, 2012 WL 3201139, at *18 (Del. Ch. Aug. 7, 2012) (finding that new disputed transactions that were otherwise identical to previously alleged transactions constituted time-barred new facts); id. at *18 n.156 (collecting cases distinguishing new allegations of fact, which are subject to the statute of limitations, and new allegations of law, which relate back). The key question is whether the preceding complaint put defendants "on notice" of the new claims. Quadrant Structured Prod. Co., Ltd. v. Vertin, No. 6990-VCL, 2015 WL 6157759, at *20 (Del. Ch. Oct. 20, 2015). The Amended Complaint names two new defendants, drops two defendants, and is based on a new factual premise: that the 2013 LTIP, including the cash awards, was in fact a continuation or "required adjustment" to employees' 2006 LTIP investments. Doc. 35 ¶ 15. This new claim does not relate back to the Original Complaint, and so the Original Complaint's August 3, 2017 date of filing does not apply.

Having found no relation back, in its now vacated order, the Court determined that the "constructive" date of filing for statute of limitations purposes should be November 30, 2017, rather than the actual date of filing of the Amended Complaint, December 7, 2018:

> On November 30, 2017, McEvoy informed the New York Bankruptcy Court that if not for the stay, he would file an Amended Complaint incorporating allegations relating to the 2013 LTIP in this Court. Doc. 112-46 at 3 n.1. At that point, Defendants had notice of McEvoy's new claims, but McEvoy could not file an amended complaint until the Bankruptcy Court

> permitted him to do so, which it did not do until October 2018. Therefore, the Court will constructively treat the date of filing of the operative Amended Complaint in this Court as November 30, 2017.

Doc. 122 at 12. However, the Court is now persuaded that there is no basis in Delaware law for establishing a "constructive filing" date for statute of limitations purposes. Even if there might be scenarios in which Delaware courts would allow for a constructive filing date, this case does not present such circumstances. First, the Bankruptcy Court footnote was filed in a different proceeding from this case. Second, the Bankruptcy Court footnote upon which the constructive filing is based does not specifically identify two of the defendants, CEVA Group, PLC, and Apollo Management IV, L.P., that were later named in the Amended Complaint. Thus, these parties were not placed on "constructive notice" of Plaintiffs' intent to file a claim against them. Third, McEvoy could have earlier filed the non-derivative case in this Court that ultimately became the Amended Complaint without running afoul of the automatic stay in the CIL Bankruptcy Proceeding. That he chose to instead file claims that implicated the CIL bankruptcy estate and to consent to a stay in this case was his choice. Delay resulting thereby in filing the Amended Complaint cannot be used to alter the filing date for statute of limitations purposes. Absent relation back, which the Court has found not to apply, the date of commencement for statute of limitations purposes is the date of the filing

of the Amended Complaint, December 7, 2018, which is well after the expiration of the statute of limitations on June 11, 2016. Thus, McEvoy must show that the claim was tolled from June 11, 2013 to at least December 7, 2015 to be timely.

### B.   Tolling Doctrines

Delaware has three doctrines that toll the statute of limitations: (1) inherently unknowable injuries; (2) fraudulent concealment; and (3) equitable tolling. In re Dean Witter, 1998 WL 442456, at *5–*6. McEvoy argues that "any or all theories available" apply. Doc. 112 at 22. The plaintiff "bear[s] the burden of pleading specific facts to demonstrate that the statute of limitations was, in fact, tolled." In re Dean Witter, 1998 WL 442456, at *6.[6] The plaintiff must plead "either that he was diligently and productively pursuing his rights before the statute of limitations expired or that he was precluded from doing so based on some unusual and unanticipated change in circumstances." Forman v. CentrifyHealth, Inc., No. CV 2018-0287-JRS, 2019 WL 1810947, at *9 (Del. Ch. Apr. 25, 2019). "What constitutes unreasonable delay and prejudice [for the delay in bringing a claim] are questions of fact that depend upon the totality of the circumstances." Deputy v. Deputy, No. CV 10874-VCZ, 2020 WL 1018554,

---

[6] The Court noted that the plaintiff is supposed to plead a basis for tolling the statute of limitations, which McEvoy had not, but permitted him to amend his complaint to make allegations that gave rise to tolling, which he then did. Docs. 81 at 22:4–9; 124.

15

at *47 (Del. Ch. Mar. 2, 2020) (quoting <u>Hudak v. Procek</u>, 806 A.2d 140, 153 (Del. 2002)).

Based on the record before the Court, a reasonable jury could find that there was fraudulent concealment because Defendants used "actual artifice" to prevent McEvoy from learning of his injury. <u>In re Dean Witter</u>, 1998 WL 442456, at *5. There is some evidence that Defendants attempted to conceal the existence of the 2013 LTIP from non-participating Management Investors. Schlanger stated that communications to former CEVA employees were intentionally different than those to present CEVA employees. Doc. 116-2 at 63:8-17. Defendants argue that these differences "demonstrate[] Defendants' good faith" and were intended to "avoid confusion." Doc. 117 at 6–7. This is not an undisputed fact. While much of McEvoy's fraudulent concealment argument relies on edits to the April 17, 2013 question and answer document, which McEvoy did not even recall reading, the document sheds light on CEVA executives' communications strategy and purposeful concealment of the 2013 LTIP to non-participating Management Investors. Doc. 98-2. There is a genuine question of material fact as to whether the statute of limitations was tolled from June 11, 2013 until at least December 7, 2015.

### C.   Inquiry Notice

Regardless of whether any tolling doctrine applies to McEvoy's claim,

> the limitations period is tolled [only] until such time that persons of ordinary intelligence and prudence would have facts sufficient to put them on inquiry which, <u>if pursued</u>, would lead to the discovery of the injury. Inquiry notice does <u>not</u> require <u>actual</u> discovery of the reason for the injury. Nor does it require plaintiffs' awareness of all of the aspects of the alleged wrongful conduct. Rather, the statute of limitations begins to run when plaintiffs should have discovered the general fraudulent scheme.

<u>In re Dean Witter</u>, 1998 WL 442456, at *7. Inquiry notice occurs when the plaintiff "encounter[s] facts that reasonably should arouse suspicion" and "lead to an investigation capable of producing facts sufficient to allow the plaintiff to file a complaint capable of surviving a motion to dismiss." <u>Gallagher Indus., LLC v. Addy</u>, No. 2018-0106-SG, 2020 WL 2789702, at *13 (Del. Ch. May 29, 2020). If McEvoy was or should have been on inquiry notice before December 7, 2015, three years before the filing date of the Amended Complaint, his claim is time-barred.

Inquiry notice generally occurs when an investor receives a "red flag[]" indicating their injury, even if they do not know the injury's full extent. <u>Gallagher</u>, 2020 WL 2789702, at *13 (citation omitted). A red flag may come in the form of "inherently contradictory information" alerting an investor to a potential claim. <u>In re Dean Witter</u>, 1998 WL 442456, at *9. It may also be a communication signaling a change in the corporate structure, such as a letter announcing a "tremendous amount of change . . . ." <u>Silverberg v. Padda</u>, No.

2017-0250-KSJM, 2019 WL 4566909, at *11 (Del. Ch. Sept. 19, 2019) (internal quotation marks omitted) (citing documents in that case's record). In <u>re Dean Witter</u>, defendants' "campaign of misinformation," including confident public filings and frequent cash distributions, was insufficient to toll the statute of limitations when plaintiffs could have seen the decline in the investment fund's capital merely by "looking beyond the language on the first page of [the] annual reports . . . ." 1998 WL 442456, at *7–8.

Even taking into account any efforts by Defendants to conceal information about the 2013 LTIP, it is reasonable to argue that McEvoy should have been on inquiry notice in 2013 when he was suddenly informed that his shares, which had been worth €50 each, were now worth €0. McEvoy had the 2006 LTIP Agreement in his possession, which he alleges mandated adjustments to his investment. McEvoy could see that CEVA continued to operate after he was let go, and that it was perhaps expanding, even hiring him temporarily to start up a new contract. He could have asked at any point if anyone in CEVA received a return on their prior investment, including during his October 2015 conversation with a CEVA executive who had also invested in the 2006 LTIP.

Other events also cumulatively contribute to inquiry notice. The JPLs in the Cayman Islands CIL liquidation informed Management Investors of the New York Bankruptcy Proceeding in a letter dated June 14, 2013. McEvoy

18

confirmed with the JPLs that his investments had lost their value on March 4, 2014. Two publicly available financial reports released November 18, 2013, and February 28, 2014 from CEVA Holdings discussed a new equity plan replacing the 2006 LTIP. Three newspaper articles mentioned CEVA's restructuring and that funds were re-invested or that Management Investors were contemplating legal action against Apollo before December 7, 2015, including a New York Post article published on September 11, 2015. Cf. Burrell v. Astrazeneca LP, No. CIV.A. 07C-01-412(SER), 2010 WL 3706584, at *6 n.64 (Del. Super. Ct. Sept. 20, 2010) (determining that articles published in papers of record including the New York Times and Wall Street Journal, combined with other sources of information, provided notice). And finally, the Bankruptcy Proceeding included public filings alleging fraudulent self-dealing and provided fodder for further inquiry. The initial complaint in the Bankruptcy Proceeding was filed on December 8, 2014, and an amended complaint on March 31, 2015.

Losing an investment would not necessarily put a reasonable investor on notice that others who had lost theirs were being given an opportunity to recover some of their lost value. But under Delaware law McEvoy was "not entitled to sit idly by, blindly relying on defendants' assurances, when the documents and disclosures plaintiffs received regularly were so suggestive of mismanagement," or in this case, breach of fiduciary duty. In re Dean Witter, 1998 WL 442456, at *9. There was ample information and opportunity available

19

between 2013 and 2015 for McEvoy to investigate whether CEVA had in fact lost all its value, and whether some Management Investors may have been allowed to participate in the 2013 LTIP. He also knew some of the allegations that he included in his Amended Complaint even before he filed his Original Complaint.[7] Before December 7, 2015, McEvoy had "facts sufficient to put [him] on inquiry, which, <u>if pursued</u>, would [have] led to discovery of the injury." <u>In re Dean Witter</u>, 1998 WL 442456 at *7. As a matter of Delaware law, McEvoy was on inquiry notice as to his potential claims before December 7, 2015. Therefore, regardless of whether any tolling applies, the three-year statute of limitations expired before the filing of the Amended Complaint on December 7, 2018. McEvoy's action is time-barred.

Accordingly, it is hereby

**ORDERED:**

1. Defendants' Joint Limited Motion for Reconsideration of Order Denying Motion for Summary Judgment (Doc. 125) is **GRANTED**.

---

[7] McEvoy alleges that in July 2017, before filing the Original Complaint, he "became aware of the existence of a document, marked confidential, showing that during the 2013 Transaction Defendants had converted certain Management Co-Investors' investments in CIL to Cash," and that in December 2017, he found "separate CIL financial statements" marked confidential and not provided to any former Management Investors. Doc. 124 ¶¶ 120–21.

2.    The Court's previous **ORDER** (Doc. 122) on Defendants' Joint Motion for Summary Judgment (Doc. 95) is **VACATED**, to be replaced with this present Order.

3.    Defendants' Joint Motion for Summary Judgment (Doc. 95) is **GRANTED**.

4.    Judgment will be entered for the Defendants. The Clerk should close the file.

**DONE AND ORDERED** in Jacksonville, Florida the 10th day of March, 2022.

TIMOTHY J. CORRIGAN
United States District Judge

agb
Copies:

Counsel of record

21